FILED
CLERK, U.S. DISTRICT COURT

06/06/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

TRACY L. WILKISON
United States Attorney
BENJAMIN J. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
CHARLES E. PELL (Cal. State Bar No. 210309)
Assistant United States Attorney
Santa Ana Branch Office
    United States Courthouse
    411 West Fourth Street, Suite 8000
    Santa Ana, California  92701
    Telephone:  (714) 338-3542
    Facsimile:  (714) 338-3561
    E-mail:     charles.e.pell2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 8:22-cr-00077-DOC |
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT ROBERT LOUIS CIRILLO |
| v. | |
| ROBERT LOUIS CIRILLO, | |
| Defendant. | |

        1.   This constitutes the plea agreement between ROBERT LOUIS

CIRILLO ("defendant") and the United States Attorney's Office for the

Central District of California (the "USAO") in the investigation of

securities fraud and tax crimes.  This agreement is limited to the

USAO and cannot bind any other federal, state, local, or foreign

prosecuting, enforcement, administrative, or regulatory authorities.

This agreement is subject to approval by the Tax Division, United

States Department of Justice.

                    DEFENDANT'S OBLIGATIONS

        2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a three-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Securities Fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a), and 17 C.F.R. § 240.10b-5 (count one), Filing False Tax Return in violation of 26 U.S.C. § 7206(1) (count two), and Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 (count three).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.   At or before the time of sentencing, make a prejudgment payment by delivering a certified check or money order to the Fiscal Clerk of the Court in the amount of $50,000 to be applied to satisfy defendant's anticipated criminal debt.  Payments may be

made to the Clerk, United States District Court, Fiscal Department,
255 East Temple Street, Room 1178, Los Angeles, California 90012.

i.   Defendant agrees that any and all criminal debt
ordered by the Court will be due in full and immediately.  The
government is not precluded from pursuing, in excess of any payment
schedule set by the Court, any and all available remedies by which to
satisfy defendant's payment of the full financial obligation,
including referral to the Treasury Offset Program.

j.   Complete the Financial Disclosure Statement on a form
provided by the USAO and, within 30 days of defendant's entry of a
guilty plea, deliver the signed and dated statement, along with all
of the documents requested therein, to the USAO by either email at
usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial
Litigation Section at 300 North Los Angeles Street, Suite 7516, Los
Angeles, CA 90012.  Defendant agrees that defendant's ability to pay
criminal debt shall be assessed based on the completed Financial
Disclosure Statement and all required supporting documents, as well
as other relevant information relating to ability to pay.

k.   Authorize the USAO to obtain a credit report upon
returning a signed copy of this plea agreement.

l.   Consent to the USAO inspecting and copying all of
defendant's financial documents and financial information held by the
United States Probation and Pretrial Services Office.

3.   Defendant admits that defendant received $3,420,877 of
unreported income for tax years 2015, 2016, and 2017.  Defendant
agrees that:

a.   Defendant will file, prior to the time of sentencing,
amended returns for the years subject to the above admissions,

3

correctly reporting unreported income; will, if requested to do so by the Internal Revenue Service, provide the Internal Revenue Service with information regarding the years covered by the returns; will pay to the Fiscal Clerk of the Court at or before sentencing all additional taxes and all penalties and interest assessed by the Internal Revenue Service on the basis of the returns; and will promptly pay to the Fiscal Clerk of the Court all additional taxes and all penalties and interest thereafter determined by the Internal Revenue Service to be owing as a result of any computational error(s).  Payments may be made to the Clerk, United States District Court, Fiscal Department, 255 East Temple Street, Room 1178, Los Angeles, California 90012.

b.   Nothing in this agreement forecloses or limits the ability of the Internal Revenue Service to examine and make adjustments to defendant's returns after they are filed.

c.   Defendant will not, after filing the returns, file any claim for refund of taxes, penalties, or interest for amounts attributable to the returns filed in connection with this plea agreement.

d.   Defendant is liable for the fraud penalty imposed by the Internal Revenue Code, 26 U.S.C. § 6663 on the understatements of tax liability for tax years 2015, 2016, and 2017.

e.   Defendant gives up any and all objections that could be asserted to the Examination Division of the Internal Revenue Service receiving materials or information obtained during the criminal investigation of this matter, including materials and information obtained through grand jury subpoenas.

f.   Defendant will sign closing agreements with the

4

Internal Revenue Service contemporaneously with the signing of this plea agreement, permitting the Internal Revenue Service to assess and collect the total sum of $675,898 for the defendant's tax years 2015 ($140,725), 2016 ($127,513), and 2017 ($407,660), which comprises the tax liabilities, as well as assess and collect the civil fraud penalty for each year and statutory interest, on the tax liabilities, as provided by law.

4.   Defendant further agrees:

a.   To forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived from or acquired as a result of the illegal activity to which defendant is pleading guilty, specifically including, but not limited to, the following: TD Ameritrade account numbers XXX-X27004 and XXX-X40165 in the name of defendant, TD Ameritrade account number XXX-X95039 in the name of Blue Ribbon Sports Partners Inc., 2017 Alfa Romeo (VIN ending in 40143), 2015 Jeep (VIN ending in 25092), 2012 Mercedes Benz (VIN ending in 24676), and $5,860USD currency seized from defendant during FBI search in August 2019 (collectively, the "Forfeitable Assets").

b.   To the Court's entry of an order of forfeiture at or before sentencing with respect to the Forfeitable Assets and to the forfeiture of the assets.

c.   To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Assets, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

d.   Not to contest any administrative forfeiture

proceedings or civil judicial proceedings commenced against the
Forfeitable Assets.  If defendant submitted a claim and/or petition
for remission for all or part of the Forfeitable Assets on behalf of
himself or any other individual or entity, defendant shall and hereby
does withdraw any such claims or petitions, and further agrees to
waive any right he may have to seek remission or mitigation of the
forfeiture of the Forfeitable Assets.

e.   Not to assist any other individual in any effort
falsely to contest the forfeiture of the Forfeitable Assets.

f.   Not to claim that reasonable cause to seize the
Forfeitable Assets was lacking.

g.   To prevent the transfer, sale, destruction, or loss of
any and all assets described above to the extent defendant has the
ability to do so.

h.   To fill out and deliver to the USAO a completed
financial statement listing defendant's assets on a form provided by
the USAO.

i.   That forfeiture of Forfeitable Assets shall not be
counted toward satisfaction of any special assessment, fine,
restitution, costs, or other penalty the Court may impose.

<u>THE USAO'S OBLIGATIONS</u>

5.   The USAO agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained
in this agreement.

c.   At the time of sentencing, provided that defendant
demonstrates an acceptance of responsibility for the offenses up to
and including the time of sentencing, recommend a two-level reduction

6

1   in the applicable Sentencing Guidelines offense level, pursuant to

2   U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

3   additional one-level reduction if available under that section.

4            d.    Recommend that defendant be sentenced to a term of

5   imprisonment no higher than the low end of the applicable Sentencing

6   Guidelines range, provided that the offense level used by the Court

7   to determine that range is 28 or higher and provided that the Court

8   does not depart downward in offense level or criminal history

9   category.  For purposes of this agreement, the low end of the

10  Sentencing Guidelines range is that defined by the Sentencing Table

11  in U.S.S.G. Chapter 5, Part A, without regard to reductions in the

12  term of imprisonment that may be permissible through the substitution

13  of community confinement or home detention as a result of the offense

14  level falling within Zone B or Zone C of the Sentencing Table.

15                          NATURE OF THE OFFENSES

16       6.    Defendant understands that for defendant to be guilty of

17  the crime charged in count one of the information, that is,

18  Securities Fraud, in violation of Title 15, United States Code,

19  Sections 78j(b) and 78ff(a), and Title 17, United States Code of

20  Federal Regulations, Section 240.10b-5, the following must be true:

21  (1) Defendant willfully used a device or scheme to defraud someone;

22  (2) Defendant's acts were undertaken in connection with the sale of a

23  security within the meaning of 15 U.S.C. § 78c(a)(10); (3) Defendant

24  directly or indirectly used the interstate wires in connection with

25  these acts; and (4) Defendant acted knowingly.

26       7.    Defendant understands that for defendant to be guilty of

27  the crime charged in count two of the information, that is, False Tax

28  Return, in violation of Title 26, United States Code, Section

7206(1), the following must be true: (1) Defendant signed and filed a tax return for the year 2017 that he knew contained false information as to a material matter; (2) The return contained a written declaration that it was being signed subject to the penalties of perjury; and (3) In filing the false tax return, defendant acted willfully.

8.    Defendant understands that for defendant to be guilty of the crime charged in count three of the information, that is, Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Section 1349, the following must be true: (1) Beginning in or around March 2021, and ending in or around April 2021, there was an agreement between two or more persons to commit wire fraud; (2) Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.  To establish a substantive violation of wire fraud in violation of Title 18, United States Code, Section 1343, the following must be true: (a) Defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) Defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) Defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

1

PENALTIES AND RESTITUTION

2       9.   Defendant understands that the statutory maximum sentence

3  that the Court can impose for a violation of Title 15, United States

4  Code, Sections 78j(b), 78ff(a), and 17 C.F.R. § 240.10b-5, is: 20

5  years' imprisonment; a three-year period of supervised release; a

6  fine of $5,000,000 or twice the gross gain or gross loss resulting

7  from the offense, whichever is greatest; and a mandatory special

8  assessment of $100.

9       10.  Defendant understands that the statutory maximum sentence

10 that the Court can impose for a violation of Title 26, United States

11 Code, Section 7206(1), is: 3 years' imprisonment; a one-year period

12 of supervised release; a fine of $250,000 or twice the gross gain or

13 gross loss resulting from the offense, whichever is greatest; and a

14 mandatory special assessment of $100.

15      11.  Defendant understands that the statutory maximum sentence

16 that the Court can impose for a violation of Title 18, United States

17 Code, Section 1349, is: 20 years' imprisonment; a three-year period

18 of supervised release; a fine of $250,000 or twice the gross gain or

19 gross loss resulting from the offense, whichever is greatest; and a

20 mandatory special assessment of $100.

21      12.  Defendant understands, therefore, that the total maximum

22 sentence for all offenses to which defendant is pleading guilty is:

23 43 years of imprisonment; a three-year period of supervised release;

24 a fine of $5,500,000 or twice the gross gain or gross loss resulting

25 from the offenses, whichever is greatest; and a mandatory special

26 assessment of $300.

27      13.  Defendant understands that defendant will be required to

28 pay full restitution to the victim(s) of the securities fraud offense

9

(count one) and wire fraud conspiracy offense (count three) to which defendant is pleading guilty.  Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offenses to which defendant is pleading guilty and in amounts greater than those alleged in the counts to which defendant is pleading guilty.  In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the securities fraud offense to which defendant is pleading guilty.  The parties currently believe that the applicable amount of restitution is approximately $2,693,331 for the securities fraud scheme and approximately $399,550 for the wire fraud conspiracy, but recognize and agree that those amounts could change based on facts that come to the attention of the parties prior to sentencing.

14.  Defendant agrees to make full restitution to the IRS as a victim of the tax offense (count two) to which defendant is pleading guilty.  Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offense to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is pleading guilty.  In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offense to which defendant is pleading guilty.  The parties currently believe that the applicable

10

amount of restitution due to the IRS is approximately $675,898, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

15.   In addition, defendant understands and agrees that the Court: (a) may order defendant to pay restitution in the form of any additional taxes, interest, and penalties that defendant owes to the United States based upon the count of conviction (count two); and (b) must order defendant to pay the costs of prosecution, which may be in addition to the statutory maximum fine stated above.

16.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

17.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a

11

professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

18.  Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the convictions in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his convictions on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his pleas may entail, even if the consequence is automatic removal from the United States.

FACTUAL BASIS

19.  Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 21 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that

1    relate to that conduct.

2          From in or around 2014 through in or around 2021, within the

3    Central District of California, defendant orchestrated and operated a

4    securities fraud scheme where he defrauded victims from Orange and

5    San Bernardino Counties into investing money with him by making false

6    promises of huge returns on their investments, when in fact,

7    defendant was using the victim-investors' funds for personal expenses

8    or to make small lulling payments to previous victim-investors.

9    During his fraudulent scheme, defendant tricked more than 100 victims

10   into giving him a total of more than $3,200,000 for his bogus

11   investments, with false promises and concealment of material facts.

12   Specifically, defendant solicited investments from the victim-

13   investors by falsely telling the victim-investors that he would be

14   investing their funds in short-term construction loans that would pay

15   large return rates that varied from approximately 15% to 30% for a 30

16   to 90-day period.  However, those representations by defendant were

17   false because defendant was not investing any of the investors' funds

18   into any such construction loans or any other investment; instead,

19   defendant was using most of the victim-investors' funds for his

20   personal benefit.  Defendant was selling investments that constituted

21   "securities" within the meaning of the Securities Exchange Act of

22   1934, which defendant knew while conducting his fraudulent scheme,

23   especially because he previously had been a Series 7 licensed broker

24   with FINRA (Financial Industry Regulatory Authority).  To effectuate

25   his fraudulent scheme, defendant used different nominee entities,

26   including Napoli Partners, Inc., Davinci Equity Partners, Inc., Genco

27   Partners, Inc., Milano Partners, Inc., and Flamingo 9.

28          During meetings with potential and existing investors, defendant

would make false statements about how much he had in the bank for the purported investments and how well the purported investments were doing.  To support those false representations and to induce victim-investors to invest, defendant would show fake documents to potential and existing victim-investors.  For example, on different occasions in 2017 and 2018, defendant showed potential and existing investors a fabricated Zurich bank statement in the name of one of the entities he was using, DA VINCI EQUITY PARNTERS [sic] INC., for the period 04/01/16 to 06/30/16, which showed an account balance of $3,076,952. A hard copy of this same false document was found during the federal search of defendant's residence in August 2019.  Defendant also showed potential and existing investors a similar fabricated Zurich bank statement in the name of NAPOLI PARTNERS, INC. that showed an account balance of $3,303,207.  Those statements were completely fabricated, because defendant had no such accounts at Zurich Bank in the names of those entities, and defendant never had anywhere near those amounts at any bank.  When defendant was interviewed by federal agents during the August 2019 search of his residence and again in June 2021, he admitted that those documents were fabricated and that he had shown them to potential or existing victim-investors to induce them to invest with him.

Defendant never invested the victim-investors' funds into any type of construction loan investment, contrary to what he was telling potential and existing victim-investors.  Instead, defendant would deposit the victim-investors' funds into various bank accounts that he controlled, and thereafter, defendant would spend those funds or withdraw them in cash, rather than using them for legitimate investment.  For example, for Bank of America bank account ending in

14

9750 in the name of Napoli Partners, Inc., from February 2015 to May 2016, approximately $1,134,000 was deposited, most of which came from victim-investors, and by the end of May 2016, the account was empty. The withdrawals during that 18-month period included approximately $369,000 in cash, $138,000 at Caesar's Palace in Las Vegas, and more than $100,000 for credit card payments for defendant's personal expenditures.  Likewise, for Wells Fargo Bank account ending in 7063 in the name of Napoli Partners, Inc., from May 2016 to February 2018, approximately $2,460,000 was deposited, most of which came from victim-investors, and by the end of February 2018, the account was empty and closed.  During that approximate 19-month period, defendant withdrew more than $1,000,000 in cash.  Moreover, over a several day period in July 2017, defendant used scheme proceeds to make a $12,000 cash down payment for a Jeep vehicle and a $10,000 cash down payment for an Alfa Romeo vehicle.  Defendant also used scheme proceeds to make more than $7,500 in car payments for defendant's Alpha Romeo.

Even though defendant knew that he would never pay the victim-investors, defendant would continually promise the victims that their payments would be coming the next week or the next month, claiming that the investment would be paid sometime soon "100%" "Guaranteed!!"

During his fraudulent scheme, defendant would also provide or cause to be provided purported investment payment checks to victim-investors, even though defendant knew that at the time he was providing those checks to the victim-investors, there were insufficient funds in the bank accounts to cover those checks.  For example, on or about August 15, 2018, defendant signed and provided to victim-investor R.M. DA VINCI EQUITY PARTNERS INC check number 1052 from Comerica Bank account ending in 8688 in the amount of

15

$5,000 and check number 818 from defendant's Bank of America account ending in 2238 in the amount of $150,000.  Both of those checks bounced when deposited by victim-investor R.M., because there were insufficient funds in those bank accounts, which defendant knew at the time he provided those checks to victim-investor R.M.  Likewise, on or about September 13, 2018, defendant signed and provided to victim-investor F.P. GENCO PARTNERS, INC. check number 1060 from Citibank account ending in 3140 in the amount of $12,000, which also bounced because there were insufficient funds in that bank account. Further, from August through November 2018, defendant wrote a total of more than $75,000 in checks to victim-investor R.G., which defendant knew would not clear because the bank account had insufficient funds.  During his fraudulent scheme, defendant provided at least 15 checks totaling more than $649,000 to victim-investors, even though defendant knew that there were insufficient funds for those checks to clear.

Further, as part of his fraudulent scheme, to attempt to trick East West Bank into honoring a fraudulent check for $620,480 payable to DaVinci Equity Partners Inc., defendant caused a fraudulent letter dated in May 2019 to be created, which falsely represented that the check was payment of an invoice.  Defendant deposited that fraudulent check, knowing it was fraudulent and that it contained forgeries in the names of D.B. and T.V.

To effectuate, and in connection with, his fraudulent scheme, defendant directly and indirectly used the means and instrumentalities of interstate commerce, including interstate wire communications and transfers.  For example, as part of his securities/investment fraud scheme, on or about June 8, 2017,

16

1  defendant received a wire transfer of $25,000 from victim-investor
2  J.H. into one of the scheme bank accounts.

3       Defendant's scheme was also an "affinity crime," which exploited
4  the trust and friendship that exist in groups of people who have
5  something in common.  Here, in his fraudulent securities/investment
6  fraud scheme, defendant targeted members of the Hispanic community,
7  including by using respected and/or trusted leaders in the Hispanic
8  community to spread the word about defendant's scheme, convincing the
9  victim-investors – many of whom were of limited means – that his
10 investments were legitimate and worthwhile.

11      When victim-investors began to realize that defendant had
12 defrauded them, defendant would threaten some victim-investors to
13 attempt to keep them quiet.  For example, when defendant was notified
14 that a victim-investor may sue him, in July 2019, defendant told a
15 third party: "Let him get a lawyer and watch what happens, OK.  Wants
16 to make [expletive] problems for me, I'll cost him a million dollars
17 in lawyer fees.  You tell him I said that.  Or he could always elect
18 to go, rather to go, for the [expletive] hole in the [expletive]
19 desert.  Tell him to test me."  After an initial story in 2019, in
20 around July 2020, Spanish language channel Univision ran a story
21 about defendant's scheme, entitled "*La pirámide del fraude:*
22 *investigación de Univision 34 sobre inversiones dudosas gana premio*
23 *de periodismo*" (roughly translated as "The pyramid scheme: Univision
24 34's investigation into questionable investments wins journalism
25 award"), reporting that various victims had invested their life
26 savings with defendant, which they ending up losing, and quoting
27 various victims, including one who noted that s/he "was sad because
28 the little [money] s/he had was now gone."  Thereafter, some victim-

investors contacted defendant and informed him that they would be reporting him to federal authorities, to which defendant responded: "I'm not a thief go f[] yourself  go to the feds  better yet do it tomorrow  you will be served so fast your f[]ing head will spin." Moreover, shortly before a victim-investor was scheduled to go to a meeting of victim-investors to discuss getting their money back from defendant, in or around June 2019, defendant texted that victim-investor a photograph of that victim-investor's residence, which the victim-investor interpreted as a threat by defendant against him. During the August 2019 search of defendant's residence, a copy of that same photograph was found on one of defendant's digital devices.

In his fraudulent securities/investment fraud scheme, defendant victimized more than 100 individuals, which resulted in substantial financial hardship to more than 25 victims.  For example, victim-investor M.Z. invested her life savings of $20,000 with defendant's scheme, which she had planned to use to retire.  When victim-investor M.Z. contacted defendant, defendant promised to pay the investment proceeds to victim-investor M.Z. on a specific date, but that date came and went, and like usual, defendant failed to pay.  After that, defendant would not answer victim-investor M.Z.'s calls, and he never paid.  The victim-investors would often beg defendant for their money back, informing him how much they really needed the money.  For example, on or about July 19, 2019, victim-investor I.M. texted defendant: "With all that money I could have done many things for my family and especially to my mom. You have no idea how bad I need my money."  The day before, victim J.H. sent defendant a similar text message: "Really hoping for good news, Nadia's grandma (Mary's mom) is in the hospital and not doing well  I'd like to help out with if I

can.  E-Jay is also struggling pretty bad."  On or about June 23, 2019, an victim-investor notified defendant that the victim-investor really needed the money back: "I just want you to know that I'm very bad economically and that I need my money as soon as possible I have my wife sick and my dad I have to operate in Mexico."

While defendant was orchestrating his securities/investment fraud scheme, defendant would also communicate about other fraudulent schemes, money laundering, and identity theft.  For example, in or around April 2019, defendant discussed laundering counterfeit money at a Las Vegas Casino, stating:

> I need you to make a call, I know you know
> people, and get me some counterfeit notes, some bills,
> hundreds, the good ones that pass the test.  If you
> could get them over to me by tomorrow, here at
> Caesar's Palace, in Las Vegas, if you could get like
> $50,000 worth, or $100,000 worth, I'll clean and wash
> the money here.  It will take me about three hours,
> and I'll send you half the money back.  Guaranteed.
> I'll clean and wash the money here, 'cause I can use
> it in the casino, and you make a quick $25,000
> tomorrow…

The next month, in or around May 2019, defendant discussed committing a different scheme – credit card fraud and identity theft, stating "you tell me what names you want them in, and um, then I can have the IDs sent to you…"  Defendant would trick victim-investors into using their mailing addresses to receive fraudulently obtained credit cards.  During the August 2019 search of defendant's residence, agents found evidence of credit card/identity theft fraud, including

19

a photograph of a fraudulently obtained credit card in the name of
E.I., which had resulted from a fraudulent application defendant had
caused in that identity.

Defendant's securities/investment fraud scheme involved
sophisticated means, including using multiple nominee entities and
creating and using multiple fabricated bank documents.

Instead of using the victim-investors' funds for investment or
other legitimate business purposes, defendant used those funds for
personal expenditures, which thus constituted taxable income to
defendant that he was required to report to the IRS and for which he
was required to pay federal income taxes.  Defendant willfully failed
to report to the IRS any of that income or any of the money that he
received, even though he knew that he was required to do so under
federal tax law.  Further, although defendant hired a tax return
preparer for some of the years at issue, he failed to tell his tax
return preparer about any of the bank accounts and entities that he
was using to receive the millions of dollars of income from his
scheme, and defendant further intentionally concealed from her that
he was using those funds for cash withdrawals and personal
expenditures.  Instead, for tax years 2015 through 2017, defendant
willfully filed false tax returns that failed to report a total of
more than $3,000,000 in income, including failing to report
approximately $742,271 in income for 2015, $692,707 for 2016, and
$1,985,899 for 2017.  On or about June 25, 2018, defendant filed a
Form 1040, U.S. Individual Income Tax Return, for himself and his
wife that reported total income of only $30,985, which defendant knew
was false because it failed to report any of the more than $1,900,000
in income that he had received during 2017 from his fraudulent

scheme.  Specifically, on line 12 of that tax return, entitled "Business income or (loss)," defendant listed only $33,985 in income, when the true figure was more than $1,900,000.  Because defendant reported such a low amount of income, he also claimed the EIC (Earned income credit), which is a credit designed to help low- to moderate-income workers and families get a tax break.  On that tax return, defendant listed his occupation as "INVESTMENT ADVISOR."  Defendant filed that tax return under the penalties of perjury, and on or about June 25, 2018, he signed IRS Form 8879 (IRS *e-file* Signature Authorization).  When filing his 2015, 2016, and 2017 false federal tax returns, defendant acted willfully, that is, defendant knew that federal tax law imposed a duty on him to accurately report the omitted income, but defendant nevertheless intentionally and voluntarily violated that duty.  Further demonstrating defendant's willfulness, while he was reporting only approximately $31,000 in income to the IRS for tax year 2017, defendant applied for an auto loan from Chase Bank in June 2017, wherein he represented that his yearly income was $150,000.

In addition to and separate from his multi-million dollar securities/investment fraud scheme, from in or around March 2021 to April 2021, defendant participated in a fraudulent scheme with others to defraud victim D.Q., a senior citizen, of approximately $400,000. In that fraudulent scheme, defendant's co-schemers tricked victim D.Q. into believing that his grandson had been arrested by the Sacramento Police Department for possession of illegal narcotics, which was false.  As part of that fraudulent scheme and to trick victim D.Q., defendant's co-schemers also pretended to be other people when communicating with victim D.Q., including posing as a

21

sergeant with the Sacramento PD, a public defender, and D.Q.'s grandson.  Through their fraudulent statements, defendant's co-schemers convinced victim D.Q. to send a total of approximately $400,000 in payments for his grandson's bail.  To receive the victim's funds, defendant opened a bank account in the name of a nominee entity by using his California driver's license, which bank account only defendant controlled.  On or about March 17, March 24, April 2, and April 14, 2021, victim D.Q. sent interstate wire transfer payments to that bank account in the amounts of $88,000, $95,000, $56,700, and $150,000, respectively.  Defendant then used the money from that account for his personal benefit, including more than $65,000 transferred directly to defendant's TD Ameritrade account and other personal expenditures.  Defendant knowingly participated in this fraudulent scheme to defraud victim D.Q. while defendant was in the Central District of California, and defendant acted with the intent to defraud and cheat.

The parties agree that for purposes of this plea agreement, the applicable loss from defendant's securities fraud scheme is approximately $3,237,262, the applicable loss from defendant's wire fraud conspiracy is approximately $399,550, and the applicable tax loss is approximately $675,898.

<u>SENTENCING FACTORS</u>

20.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have

any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

21.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

Count One (securities fraud):

| | | |
|---|---|---|
| Base Offense Level | 7 | U.S.S.G. § 2B1.1(a)(1) |
| $1.5mm < loss < $3.5mm | +16 | U.S.S.G. § 2B1.1(b)(1)(I) |
| Substantial financial hardship ≥ 25 victims | +6 | U.S.S.G. § 2B1.1(b)(2)(C) |
| Sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |

Count Two (false tax return):

| | | |
|---|---|---|
| Base Offense Level ($550k < tax loss < $1.5mm) | 20 | U.S.S.G. § 2T1.1(a)(1), 2T4.1(H) |
| >$10,000 criminal activity: | +2 | U.S.S.G. § 2T1.1(b)(1) |

Count Three (wire fraud conspiracy):

| | | |
|---|---|---|
| Base Offense Level | 7 | U.S.S.G. § 2B1.1(a)(1) |
| $250,000 < loss < $550,000 | +12 | U.S.S.G. § 2B1.1(b)(1)(G) |
| Sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Vulnerable victim | +2 | U.S.S.G. § 3A1.1(b)(1) |

Combined offense level calculation:

| | | |
|---|---|---|
| Group One (counts 1 and 3): | 1 unit | U.S.S.G. § 3D1.4(a) |
| Group Two (count 2): | ½ unit | U.S.S.G. § 3D1.4(b) |
| Total Units: | 1 ½ units | |

///

///

**FINAL COMBINED OFFENSE LEVEL**

| | | |
|---|---|---|
| Total offense level count-1: | 31 | |
| Increase from grouping: | +1 | U.S.S.G. § 3D1.4 |
| Acceptance of responsibility: | -3 | U.S.S.G. § 3E1.1 |

**Combined Total Offense Level:**     **29**

The USAO will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraphs 2, 3, and 4 are met and if defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below.  Subject to paragraph 34 below, defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed.  Defendant agrees, however, that if, after signing this agreement but prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set forth in that section and to argue that defendant is not entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1..

22.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

23.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing

24

1  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),
2  (a)(2), (a)(3), (a)(6), and (a)(7).

3  <u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

4  24.  Defendant understands that by pleading guilty, defendant
5  gives up the following rights:

6  a.  The right to persist in a plea of not guilty.

7  b.  The right to a speedy and public trial by jury.

8  c.  The right to be represented by counsel -- and if
9  necessary have the Court appoint counsel -- at trial.  Defendant
10 understands, however, that, defendant retains the right to be
11 represented by counsel -- and if necessary have the Court appoint
12 counsel -- at every other stage of the proceeding.

13 d.  The right to be presumed innocent and to have the
14 burden of proof placed on the government to prove defendant guilty
15 beyond a reasonable doubt.

16 e.  The right to confront and cross-examine witnesses
17 against defendant.

18 f.  The right to testify and to present evidence in
19 opposition to the charges, including the right to compel the
20 attendance of witnesses to testify.

21 g.  The right not to be compelled to testify, and, if
22 defendant chose not to testify or present evidence, to have that
23 choice not be used against defendant.

24 h.  Any and all rights to pursue any affirmative defenses,
25 Fourth Amendment or Fifth Amendment claims, and other pretrial
26 motions that have been filed or could be filed.

27 <u>WAIVER OF APPEAL OF CONVICTION</u>

28 25.  Defendant understands that, with the exception of an appeal

based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

<u>WAIVER OF APPEAL AND COLLATERAL ATTACK</u>

26.  Defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court, including, to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) the amount and terms of any restitution order, provided it requires payment of no more than $4,000,000; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7); and any conditions of probation or supervised release agreed to by defendant in paragraph 2 above.

27.  Defendant also gives up any right to bring a post-conviction collateral attack on the convictions or sentence,

including any order of restitution, except a post-conviction
collateral attack based on a claim of ineffective assistance of
counsel, a claim of newly discovered evidence, or an explicitly
retroactive change in the applicable Sentencing Guidelines,
sentencing statutes, or statutes of conviction.  Defendant
understands that this waiver includes, but is not limited to,
arguments that the statutes to which defendant is pleading guilty are
unconstitutional, and any and all claims that the statement of facts
provided herein is insufficient to support defendant's pleas of
guilty.

28.  This agreement does not affect in any way the right of the
USAO to appeal the sentence imposed by the Court.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

29.  Defendant agrees that if, after entering guilty pleas
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty pleas on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its
obligations under this agreement; and (b) should the USAO choose to
pursue any charge that was either dismissed or not filed as a result
of this agreement, then (i) any applicable statute of limitations
will be tolled between the date of defendant's signing of this
agreement and the filing commencing any such action; and
(ii) defendant waives and gives up all defenses based on the statute
of limitations, any claim of pre-indictment delay, or any speedy
trial claim with respect to any such action, except to the extent
that such defenses existed as of the date of defendant's signing this
agreement.

1

EFFECTIVE DATE OF AGREEMENT

2      30.  This agreement is effective upon signature and execution of

3 all required certifications by defendant, defendant's counsel, and an

4 Assistant United States Attorney.

5

BREACH OF AGREEMENT

6      31.  Defendant agrees that if defendant, at any time after the

7 signature of this agreement and execution of all required

8 certifications by defendant, defendant's counsel, and an Assistant

9 United States Attorney, knowingly violates or fails to perform any of

10 defendant's obligations under this agreement ("a breach"), the USAO

11 may declare this agreement breached.  All of defendant's obligations

12 are material, a single breach of this agreement is sufficient for the

13 USAO to declare a breach, and defendant shall not be deemed to have

14 cured a breach without the express agreement of the USAO in writing.

15 If the USAO declares this agreement breached, and the Court finds

16 such a breach to have occurred, then: (a) if defendant has previously

17 entered guilty pleas pursuant to this agreement, defendant will not

18 be able to withdraw the guilty pleas, and (b) the USAO will be

19 relieved of all its obligations under this agreement.

20      32.  Following the Court's finding of a knowing breach of this

21 agreement by defendant, should the USAO choose to pursue any charge

22 that was either dismissed or not filed as a result of this agreement,

23 then:

24           a.  Defendant agrees that any applicable statute of

25 limitations is tolled between the date of defendant's signing of this

26 agreement and the filing commencing any such action.

27           b.  Defendant waives and gives up all defenses based on

28 the statute of limitations, any claim of pre-indictment delay, or any

speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.   Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
OFFICE NOT PARTIES

33.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

34.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it

29

chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 20 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

35.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

36.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

37.  The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the

1   entire agreement had been read into the record of the proceeding.

2   AGREED AND ACCEPTED

3   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
4   CALIFORNIA

5   TRACY L. WILKISON
    United States Attorney
6

7   _____          06.03.2022
                                              _____
8   CHARLES E. PELL                           Date
    Assistant United States Attorney
9   _____          5/19/22
                                              _____
10  ROBERT LOUIS CIRILLO                      Date
    Defendant
11  _____          5/19/22
                                              _____
12  RON HEDDING                               Date
    Attorney for Defendant
13  ROBERT LOUIS CIRILLO

14                    CERTIFICATION OF DEFENDANT

15       I have read this agreement in its entirety.  I have had enough

16  time to review and consider this agreement, and I have carefully and

17  thoroughly discussed every part of it with my attorney.  I understand

18  the terms of this agreement, and I voluntarily agree to those terms.

19  I have discussed the evidence with my attorney, and my attorney has

20  advised me of my rights, of possible pretrial motions that might be

21  filed, of possible defenses that might be asserted either prior to or

22  at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

23  of relevant Sentencing Guidelines provisions, and of the consequences

24  of entering into this agreement.  No promises, inducements, or

25  representations of any kind have been made to me other than those

26  contained in this agreement.  No one has threatened or forced me in

27  any way to enter into this agreement.  I am satisfied with the

28  representation of my attorney in this matter, and I am pleading

                                  31

guilty because I am guilty of the charges and wish to take advantage
of the promises set forth in this agreement, and not for any other
reason.

_____     5/19/22
ROBERT LOUIS CIRILLO                 _____
Defendant                            Date

## CERTIFICATION OF DEFENDANT'S ATTORNEY

     I am ROBERT LOUIS CIRILLO's attorney.  I have carefully and
thoroughly discussed every part of this agreement with my client.
Further, I have fully advised my client of his rights, of possible
pretrial motions that might be filed, of possible defenses that might
be asserted either prior to or at trial, of the sentencing factors
set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines
provisions, and of the consequences of entering into this agreement.
To my knowledge: no promises, inducements, or representations of any
kind have been made to my client other than those contained in this
agreement; no one has threatened or forced my client in any way to
enter into this agreement; my client's decision to enter into this
agreement is an informed and voluntary one; and the factual basis set
forth in this agreement is sufficient to support my client's entry of
guilty pleas pursuant to this agreement.

_____     5/19/22
RON HEDDING                          _____
Attorney for Defendant               Date
ROBERT LOUIS CIRILLO

32