STEPHANIE S. CHRISTENSEN
Acting United States Attorney
BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
CHARLES E. PELL (Cal. SBN 210309)
Assistant United States Attorney
Santa Ana Branch Office
     411 West Fourth Street, Suite 8000
     Santa Ana, California 92701
     Telephone: (714) 338-3542
     Facsimile: (714) 338-3561
     E-mail:    charles.e.pell2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 8:22-cr-00077-DOC |
|       Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT ROBERT LOUIS CIRILLO |
|          v. | |
| ROBERT LOUIS CIRILLO, | Hearing Date: September 6, 2022<br>Hearing Time: 7:30 a.m. |
|       Defendant. | |

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, plaintiff United States of America, by and through its counsel of record, the acting United States Attorney for the Central District of California and Assistant United States Attorney Charles E. Pell, hereby files its sentencing position for defendant ROBERT LOUIS CIRILLO.

This sentencing position is based upon the attached memorandum

1  of points and authorities, the files and records in this case, and

2  such further evidence and argument as the Court may permit.

3  Dated: August 30, 2022          Respectfully submitted,

4                                  STEPHANIE S. CHRISTENSEN
                                   Acting United States Attorney
5
                                   BENJAMIN R. BARRON
6                                  Assistant United States Attorney
                                   Chief, Santa Ana Branch Office
7

8                                  /s/ *Charles E. Pell*
                                   CHARLES E. PELL
9                                  Assistant United States Attorney
                                   Santa Ana Branch Office
10
                                   Attorneys for Plaintiff
11                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

I.      INTRODUCTION................................................................1

II.     BACKGROUND..................................................................4

        A. Plea agreement ..........................................................4

        B. Factual Background ......................................................5

III.    THE PSR'S CALCULATIONS AND RECOMMENDATION....................16

        A. PSR's Guideline calculations ..........................................16

        B. Section 2B1.1(b)(2): substantial financial

           hardship to victims ....................................................17

        C. Grouping calculation ..................................................19

IV.     VICTIM LETTERS............................................................21

V.      RECENT OBSTRUCTIVE AND FRAUDLENT ACTIONS BY DEFENDANT.......23

VI.     GOVERNMENT'S POSITION REGARDING SENTENCING....................24

        A. Summary of the Government's Position ..................................24

        B. The § 3553(a) factors call for the recommended

           Sentence............................................................... 25

           1. Nature, Circumstances, and Seriousness of the

              Offenses............................................................26

           2. Defendant's history and characteristic................26

           3. Adequate deterrence to defendant and the public.......28

           4. Need to Protect the Public from Defendant.............28

           5. Need to Avoid Unwarranted Sentence Disparities........29

        C. Restitution..............................................................29

VII. CONCLUSION....................................................................30

i

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION**

3       Defendant Robert Louis Cirillo victimized more than 100 people

4    to steal more than $3,000,000 from them in his investment fraud

5    scheme, which targeted Hispanics, many of whom were of limited means.

6    Late last year, defendant also participated in a conspiracy to

7    defraud an 82-year old victim of approximately $400,000 in a so-

8    called "Grandparent scam," where defendant received the proceeds.

9    Last, defendant failed to pay more than $675,000 taxes due from the

10   income from his fraudulent schemes.  The government respectfully

11   recommends that the Court sentence defendant to <u>87 months of</u>

12   <u>imprisonment</u>, which is the low end of the Guidelines range.

13      Defendant orchestrated and ran a huge investment fraud scheme

14   where he stole more than $3 million from over 100 victims by tricking

15   them into investing in his bogus construction loan scheme, using both

16   lies and fake documents.  What he failed to tell the victims was that

17   he was not using their money for purported investments, but rather,

18   he was spending their money on himself, including more than $1

19   million in cash withdrawals.  What he failed to tell the victims

20   about the Zurich bank statement with a $3mm account balance that he

21   showed to them was that it was fake – defendant had fabricated it.

22   What he failed to tell the victims was that they would never get

23   their money back, but that he would be millions of dollars richer.

24      Defendant's behavior was despicable, particularly because he was

25   engaging in an affinity crime by exploiting members of the Hispanic

26   community, most of whom were of modest means, and some of whom lost

27   their life savings to defendant.  It's heartbreaking to read the

28   victims' messages to defendant, where they were desperate and would

beg defendant for any of their money back, *e.g.*, "I just want you to know that I'm very bad economically and that I need my money as soon as possible I have my wife sick and my dad I have to operate in Mexico."  Defendant would further trick the victims by providing them with purported payment checks, which he knew would bounce because there were insufficient funds in the bank account(s).

When victims began to realize that defendant had defrauded them, defendant would threaten some of them to attempt to keep them quiet, including sending one victim a photograph of that victim's residence, which the victim interpreted as a threat by defendant against him. In another instance, defendant left a message about a victim, threatening that the victim could go "for the [expletive] hole in the [expletive] desert.  Tell him to test me."  Another victim wrote in her victim letter to this Court: "I had to change my cellphone number and my address because of the threats that [defendant] made me by phone and calls."

Further, in addition to his investment fraud scheme, in 2021, defendant participated in a scheme with others to defraud a senior citizen of approximately $400,000 in a so-called Grandparent scam, where the victim was tricked into sending money to defendant's bank account believing that it would help the victim's grandson, which was all a trick.  Defendant then used those fraudulently obtained funds for himself, including more than $65,000 transferred to defendant's TD Ameritrade account.

Defendant also failed to report any of the illicit income on his tax returns, causing a tax loss of approximately $675,000.

In addition to demonstrating his criminal character during the operation of his fraudulent schemes, defendant further spotlighted

his lack of respect for the law when discussing and/or engaging in other frauds, including money laundering, identity theft, and counterfeit currency.  For example, during the August 2019 search of defendant's residence, agents found a photograph of a credit card in someone else's name, which had resulted from a fraudulent application defendant had caused in that identity.

Moreover, defendant's schemes were not a one-time affair, but rather, defendant operated them for years victimized more than 100 people.  His schemes were also varied – from investment fraud to the Grandfather scam to discussing other frauds.

Last, recently obtained information shows that even after pleading guilty and while pending sentencing in this case, defendant has not ceased his fraudulent behavior, but instead, he has continued, including convincing a victim to give him hundreds of dollars more and providing worthless checks to victims.  Further, defendant attempted to obstruct justice by trying to destroy evidence.  Defendant's continued fraudulent behavior highlights that the sentence in this case needs to specifically deter defendant.

With the exception of Section 2B1.1(b)(2)(C)'s adjustment for substantial financial hardship for 25 or more victims (which defendant admitted in the plea agreement) and the applicable grouping increase, the government does not object to the Guidelines calculations of the Probation Office as set forth in the PSR.  With the additional levels for the substantial financial hardship and decreased levels for grouping, the government believes that the final offense level is actually two level higher than calculated by the PSR – 29/I, which equates to 87 to 108 months of imprisonment (instead of the PSR's 70-87 month range).

1    Based upon the facts and applicable Section 3553(a) factors,

2    including specific and general deterrence, the government believes

3    that a low end sentence based upon a final offense level of 29/I is

4    reasonable in this case: <u>87 months of imprisonment</u>, followed by 3

5    years of supervised release, and $3,835,358.53 in restitution.[1]

6    **II.  BACKGROUND**

7        **A.   Plea agreement**

8        Defendant pleaded guilty to all three counts of the information

9    against him: securities fraud (count one), false tax return (count

10   two), and wire fraud conspiracy (count three).  (PSR ¶¶ 1-3.)  The

11   statutory maximum sentence that the Court can impose for all counts

12   is 43 years of imprisonment (20 years for count one, three years for

13   count two, and 20 years for count three), a three-year period of

14   supervised release, a fine of $5,500,000 ($5,000,000 for count one,

15   $250,000 for count two,[2] and $250,000 for count three), and mandatory

16   special assessments of $300.  (*Id*. ¶¶ 167, 170, 176.)

17       In the plea agreement, the parties stipulated that the following

18   guidelines calculations are correct, and agreed not to argue that

19   additional offense characteristics, adjustments, and departures

20   apply:

21   <u>Count One (securities fraud)</u>:

22   Base Offense Level              7        U.S.S.G. § 2B1.1(a)(1)

23

24       [1] The total restitution figure is comprised of the sum of the
     following: (1) $2,759,910.53 to the individual victims from count
25   one; (2) $675,898 to the IRS for count two; and (3) $399,550 to
     victim D.Q. for count three.

26       [2] The PSR concluded that the applicable fine for count two (26
     U.S.C. § 7206(1)) was only $100,000.  (PSR ¶ 176.)  Section 7206 does
27   provide for a fine of only $100,000.  However, under 18 U.S.C.
     § 3571, the applicable fine should be the higher general fine of
28   $250,000 applicable to felonies, because Section 7206(1) does not
     exclude that general fine.

| | | |
|---|---|---|
| $1.5mm < loss < $3.5mm | +16 | U.S.S.G. § 2B1.1(b)(1)(I) |
| Substantial financial hardship ≥ 25 victims | +6 | U.S.S.G. § 2B1.1(b)(2)(C) |
| Sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |

Count Two (false tax return):

| | | |
|---|---|---|
| Base Offense Level ($550k < tax loss < $1.5mm) | 20 | U.S.S.G. § 2T1.1(a)(1), 2T4.1(H) |
| >$10,000 criminal activity: | +2 | U.S.S.G. § 2T1.1(b)(1) |

Count Three (wire fraud conspiracy):

| | | |
|---|---|---|
| Base Offense Level | 7 | U.S.S.G. § 2B1.1(a)(1) |
| $250,000 < loss < $550,000 | +12 | U.S.S.G. § 2B1.1(b)(1)(G) |
| Sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Vulnerable victim | +2 | U.S.S.G. § 3A1.1(b)(1) |

Combined offense level calculation:

| | | |
|---|---|---|
| Group One (counts 1 and 3): | 1 unit | U.S.S.G. § 3D1.4(a) |
| Group Two (count 2): | ½ unit | U.S.S.G. § 3D1.4(b) |
| Total Units: | 1½ units | |

**FINAL COMBINED OFFENSE LEVEL**

| | | |
|---|---|---|
| Total offense level count-1: | 31 | |
| Increase from grouping: | +1 | U.S.S.G. § 3D1.4 |
| Acceptance of responsibility: | -3 | U.S.S.G. § 3E1.1 |
| **Combined Total Offense Level:** | **29** | |

(PSR ¶¶ 6-8; Plea Agreement (DE6) ¶ 21.)

### B. Factual Background

Defendant agreed to the following facts as part of the plea agreement and change of plea hearing:

**Securities/investment fraud scheme (count one)**

- From in or around 2014 through in or around 2021, within the Central District of California, defendant orchestrated and

5

operated a securities fraud scheme where he defrauded victims from Orange and San Bernardino Counties into investing money with him by making false promises of huge returns on their investments, when in fact, defendant was using the victim-investors' funds for personal expenses or to make small lulling payments to previous victim-investors.  During his fraudulent scheme, defendant tricked more than 100 victims into giving him a total of more than $3,200,000 for his bogus investments, with false promises and concealment of material facts.  Specifically, defendant solicited investments from the victim-investors by falsely telling the victim-investors that he would be investing their funds in short-term construction loans that would pay large return rates that varied from approximately 15% to 30% for a 30 to 90-day period.  However, those representations by defendant were false because defendant was not investing any of the investors' funds into any such construction loans or any other investment; instead, defendant was using most of the victim-investors' funds for his personal benefit.  Defendant was selling investments that constituted "securities" within the meaning of the Securities Exchange Act of 1934, which defendant knew while conducting his fraudulent scheme, especially because he previously had been a Series 7 licensed broker with FINRA (Financial Industry Regulatory Authority).  To effectuate his fraudulent scheme, defendant used different nominee entities, including Napoli Partners, Inc., Davinci Equity Partners, Inc., Genco Partners, Inc., Milano Partners, Inc., and Flamingo 9.

- During meetings with potential and existing investors, defendant would make false statements about how much he had in the bank for the purported investments and how well the purported

investments were doing.  To support those false representations and to induce victim-investors to invest, defendant would show fake documents to potential and existing victim-investors.  For example, on different occasions in 2017 and 2018, defendant showed potential and existing investors a fabricated Zurich bank statement in the name of one of the entities he was using, DA VINCI EQUITY PARNTERS [sic] INC., for the period 04/01/16 to 06/30/16, which showed an account balance of $3,076,952.  A hard copy of this same false document was found during the federal search of defendant's residence in August 2019.  Defendant also showed potential and existing investors a similar fabricated Zurich bank statement in the name of NAPOLI PARTNERS, INC. that showed an account balance of $3,303,207.  Those statements were completely fabricated, because defendant had no such accounts at Zurich Bank in the names of those entities, and defendant never had anywhere near those amounts at any bank.  When defendant was interviewed by federal agents during the August 2019 search of his residence and again in June 2021, he admitted that those documents were fabricated and that he had shown them to potential or existing victim-investors to induce them to invest with him.

- Defendant never invested the victim-investors' funds into any type of construction loan investment, contrary to what he was telling potential and existing victim-investors.  Instead, defendant would deposit the victim-investors' funds into various bank accounts that he controlled, and thereafter, defendant would spend those funds or withdraw them in cash, rather than using them for legitimate investment.  For example, for Bank of America bank account ending in 9750 in the name of Napoli Partners, Inc., from February 2015 to May 2016, approximately $1,134,000 was deposited, most of

7

which came from victim-investors, and by the end of May 2016, the account was empty.  The withdrawals during that 18-month period included approximately $369,000 in cash, $138,000 at Caesar's Palace in Las Vegas, and more than $100,000 for credit card payments for defendant's personal expenditures.  Likewise, for Wells Fargo Bank account ending in 7063 in the name of Napoli Partners, Inc., from May 2016 to February 2018, approximately $2,460,000 was deposited, most of which came from victim-investors, and by the end of February 2018, the account was empty and closed.  During that approximate 19-month period, defendant withdrew more than $1,000,000 in cash.  Moreover, over a several day period in July 2017, defendant used scheme proceeds to make a $12,000 cash down payment for a Jeep vehicle and a $10,000 cash down payment for an Alfa Romeo vehicle.  Defendant also used scheme proceeds to make more than $7,500 in car payments for defendant's Alpha Romeo.

- Even though defendant knew that he would never pay the victim-investors, defendant would continually promise the victims that their payments would be coming the next week or the next month, claiming that the investment would be paid sometime soon "100%" "Guaranteed!!"

- During his fraudulent scheme, defendant would also provide or cause to be provided purported investment payment checks to victim-investors, even though defendant knew that at the time he was providing those checks to the victim-investors, there were insufficient funds in the bank accounts to cover those checks.  For example, on or about August 15, 2018, defendant signed and provided to victim-investor R.M. DA VINCI EQUITY PARTNERS INC check number 1052 from Comerica Bank account ending in 8688 in the amount of

$5,000 and check number 818 from defendant's Bank of America account ending in 2238 in the amount of $150,000.  Both of those checks bounced when deposited by victim-investor R.M., because there were insufficient funds in those bank accounts, which defendant knew at the time he provided those checks to victim-investor R.M.  Likewise, on or about September 13, 2018, defendant signed and provided to victim-investor F.P. GENCO PARTNERS, INC. check number 1060 from Citibank account ending in 3140 in the amount of $12,000, which also bounced because there were insufficient funds in that bank account.  Further, from August through November 2018, defendant wrote a total of more than $75,000 in checks to victim-investor R.G., which defendant knew would not clear because the bank account had insufficient funds.  During his fraudulent scheme, defendant provided at least 15 checks totaling more than $649,000 to victim-investors, even though defendant knew that there were insufficient funds for those checks to clear.

- Further, as part of his fraudulent scheme, to attempt to trick East West Bank into honoring a fraudulent check for $620,480 payable to DaVinci Equity Partners Inc., defendant caused a fraudulent letter dated in May 2019 to be created, which falsely represented that the check was payment of an invoice.  Defendant deposited that fraudulent check, knowing it was fraudulent and that it contained forgeries in the names of D.B. and T.V.

To effectuate, and in connection with, his fraudulent scheme, defendant directly and indirectly used the means and instrumentalities of interstate commerce, including interstate wire communications and transfers.  For example, as part of his securities/investment fraud scheme, on or about June 8, 2017,

defendant received a wire transfer of $25,000 from victim-investor J.H. into one of the scheme bank accounts.

Defendant's scheme was also an "affinity crime," which exploited the trust and friendship that exist in groups of people who have something in common. Here, in his fraudulent securities/investment fraud scheme, defendant targeted members of the Hispanic community, including by using respected and/or trusted leaders in the Hispanic community to spread the word about defendant's scheme, convincing the victim-investors – many of whom were of limited means – that his investments were legitimate and worthwhile.

When victim-investors began to realize that defendant had defrauded them, defendant would threaten some victim-investors to attempt to keep them quiet. For example, when defendant was notified that a victim-investor may sue him, in July 2019, defendant told a third party: "Let him get a lawyer and watch what happens, OK. Wants to make [expletive] problems for me, I'll cost him a million dollars in lawyer fees. You tell him I said that. Or he could always elect to go, rather to go, for the [expletive] hole in the [expletive] desert. Tell him to test me." After an initial story in 2019, in around July 2020, Spanish language channel Univision ran a story about defendant's scheme, entitled "*La pirámide del fraude: investigación de Univision 34 sobre inversiones dudosas gana premio de periodismo*" (roughly translated as "The pyramid scheme: Univision 34's investigation into questionable investments wins journalism award"), reporting that various victims had invested their life savings with defendant, which they ending up losing, and quoting various victims, including one who noted that s/he "was sad because the little [money] s/he had was now gone." Thereafter, some victim-

investors contacted defendant and informed him that they would be
reporting him to federal authorities, to which defendant responded:
"I'm not a thief go f[] yourself  go to the feds   better yet do it
tomorrow  you will be served so fast your f[]ing head will spin."
Moreover, shortly before a victim-investor was scheduled to go to a
meeting of victim-investors to discuss getting their money back from
defendant, in or around June 2019, defendant texted that victim-
investor a photograph of that victim-investor's residence, which the
victim-investor interpreted as a threat by defendant against him.
During the August 2019 search of defendant's residence, a copy of
that same photograph was found on one of defendant's digital devices.

- In his fraudulent securities/investment fraud scheme,
defendant victimized more than 100 individuals, which resulted in
substantial financial hardship to more than 25 victims.   For
example, victim-investor M.Z. invested her life savings of $20,000
with defendant's scheme, which she had planned to use to retire.
When victim-investor M.Z. contacted defendant, defendant promised to
pay the investment proceeds to victim-investor M.Z. on a specific
date, but that date came and went, and like usual, defendant failed
to pay.  After that, defendant would not answer victim-investor
M.Z.'s calls, and he never paid.  The victim-investors would often
beg defendant for their money back, informing him how much they
really needed the money.  For example, on or about July 19, 2019,
victim-investor I.M. texted defendant: "With all that money I could
have done many things for my family and especially to my mom. You
have no idea how bad I need my money."  The day before, victim J.H.
sent defendant a similar text message: "Really hoping for good news,
Nadia's grandma (Mary's mom) is in the hospital and not doing well

11

I'd like to help out with if I can.  E-Jay is also struggling pretty bad."  On or about June 23, 2019, an victim-investor notified defendant that the victim-investor really needed the money back: "I just want you to know that I'm very bad economically and that I need my money as soon as possible I have my wife sick and my dad I have to operate in Mexico."

- While defendant was orchestrating his securities/investment fraud scheme, defendant would also communicate about other fraudulent schemes, money laundering, and identity theft. For example, in or around April 2019, defendant discussed laundering counterfeit money at a Las Vegas Casino, stating:

> I need you to make a call, I know you know
> people, and get me some counterfeit notes, some bills,
> hundreds, the good ones that pass the test.  If you
> could get them over to me by tomorrow, here at
> Caesar's Palace, in Las Vegas, if you could get like
> $50,000 worth, or $100,000 worth, I'll clean and wash
> the money here.  It will take me about three hours,
> and I'll send you half the money back.  Guaranteed.
> I'll clean and wash the money here, 'cause I can use
> it in the casino, and you make a quick $25,000
> tomorrow…

The next month, in or around May 2019, defendant discussed committing a different scheme – credit card fraud and identity theft, stating "you tell me what names you want them in, and um, then I can have the IDs sent to you…"  Defendant would trick victim-investors into using their mailing addresses to receive fraudulently obtained credit cards.  During the August 2019 search of defendant's residence,

1  agents found evidence of credit card/identity theft fraud, including

2  a photograph of a fraudulently obtained credit card in the name of

3  E.I., which had resulted from a fraudulent application defendant had

4  caused in that identity.

5          •   Defendant's securities/investment fraud scheme

6  involved sophisticated means, including using multiple nominee

7  entities and creating and using multiple fabricated bank documents.

8  (Plea Agreement (DE 6) at 9-20.)

9          **Grandparent distress fraud/wire fraud conspiracy (count three)**

10         •   In addition to and separate from his multi-million

11  dollar securities/investment fraud scheme, from in or around March

12  2021 to April 2021, defendant participated in a fraudulent scheme

13  with others to defraud victim D.Q., a senior citizen, of

14  approximately $400,000.  In that fraudulent scheme, defendant's co-

15  schemers tricked victim D.Q. into believing that his grandson had

16  been arrested by the Sacramento Police Department for possession of

17  illegal narcotics, which was false.  As part of that fraudulent

18  scheme and to trick victim D.Q., defendant's co-schemers also

19  pretended to be other people when communicating with victim D.Q.,

20  including posing as a sergeant with the Sacramento PD, a public

21  defender, and D.Q.'s grandson.  Through their fraudulent statements,

22  defendant's co-schemers convinced victim D.Q. to send a total of

23  approximately $400,000 in payments for his grandson's bail.  To

24  receive the victim's funds, defendant opened a bank account in the

25  name of a nominee entity by using his California driver's license,

26  which bank account only defendant controlled.  On or about March 17,

27  March 24, April 2, and April 14, 2021, victim D.Q. sent interstate

28  wire transfer payments to that bank account in the amounts of

$88,000, $95,000, $56,700, and $150,000, respectively.  Defendant then used the money from that account for his personal benefit, including more than $65,000 transferred directly to defendant's TD Ameritrade account and other personal expenditures.  Defendant knowingly participated in this fraudulent scheme to defraud victim D.Q. while defendant was in the Central District of California, and defendant acted with the intent to defraud and cheat.

(*Id*. at 21-22.)

**False tax return**

- Instead of using the victim-investors' funds for investment or other legitimate business purposes, defendant used those funds for personal expenditures, which thus constituted taxable income to defendant that he was required to report to the IRS and for which he was required to pay federal income taxes.  Defendant willfully failed to report to the IRS any of that income or any of the money that he received, even though he knew that he was required to do so under federal tax law.  Further, although defendant hired a tax return preparer for some of the years at issue, he failed to tell his tax return preparer about any of the bank accounts and entities that he was using to receive the millions of dollars of income from his scheme, and defendant further intentionally concealed from her that he was using those funds for cash withdrawals and personal expenditures.  Instead, for tax years 2015 through 2017, defendant willfully filed false tax returns that failed to report a total of more than $3,000,000 in income, including failing to report approximately $742,271 in income for 2015, $692,707 for 2016, and $1,985,899 for 2017.  On or about June 25, 2018, defendant filed a Form 1040, U.S. Individual Income Tax Return, for himself and his

wife that reported total income of only $30,985, which defendant knew was false because it failed to report any of the more than $1,900,000 in income that he had received during 2017 from his fraudulent scheme.  Specifically, on line 12 of that tax return, entitled "Business income or (loss)," defendant listed only $33,985 in income, when the true figure was more than $1,900,000.  Because defendant reported such a low amount of income, he also claimed the EIC (Earned income credit), which is a credit designed to help low- to moderate-income workers and families get a tax break.  On that tax return, defendant listed his occupation as "INVESTMENT ADVISOR."  Defendant filed that tax return under the penalties of perjury, and on or about June 25, 2018, he signed IRS Form 8879 (IRS *e-file* Signature Authorization).  When filing his 2015, 2016, and 2017 false federal tax returns, defendant acted willfully, that is, defendant knew that federal tax law imposed a duty on him to accurately report the omitted income, but defendant nevertheless intentionally and voluntarily violated that duty.  Further demonstrating defendant's willfulness, while he was reporting only approximately $31,000 in income to the IRS for tax year 2017, defendant applied for an auto loan from Chase Bank in June 2017, wherein he represented that his yearly income was $150,000.

(*Id*. at 20-21.)

### **Applicable loss amounts**

The parties also agreed that the attempted loss from the securities fraud scheme is approximately $3,237,262, the applicable loss from defendant's wire fraud conspiracy is approximately $399,550, and the applicable tax loss is approximately $675,898. (*Id*. at 22.)

15

## III. THE PSR'S CALCULATIONS AND RECOMMENDATION

### A.   PSR's Guideline calculations

The PSR calculates defendant's Guidelines sentencing range as 70 to 87 months of imprisonment, based upon a total offense level of 27 and criminal history category of I.  (PSR ¶ 168.)  The Probation Officer ultimately recommended a below Guidelines sentence of a 63 months of imprisonment.  (DE 17 at 2.)

The PSR's Guidelines calculations are summarized as follows (PSR paragraph identified in parentheses):

Count 1 (securities fraud/investment fraud)

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) (¶ 63) |
| $1.5mm < Loss < $3.5mm: | +16 | U.S.S.G. § 2B1.1(b)(1)(L) (¶ 65) |
| Financial hardship: | +2 | U.S.S.G. § 2B1.1(b)(2)(A) (¶ 68) |
| Sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) (¶ 71) |
| Subtotal | 27 | |

Count 2 (false tax return)

| | | |
|---|---|---|
| Base offense level: | 20 | U.S.S.G. § 2T1.1(a)/2T4.1(I) (¶76) |
| >$10k criminal: | +2 | U.S.S.G. § 2T1.1(b)(1) (¶ 77) |
| Subtotal | 22 | |

Count 3(wire fraud conspiracy)

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) (¶ 82a) |
| $250k < Loss < $550k: | +12 | U.S.S.G. § 2B1.1(b)(1)(L) (¶ 82b) |
| Sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) (¶ 82e) |
| Vulnerable victim: | +2 | U.S.S.G. § 3A1.1 (¶ 85) |
| Subtotal | 23 | |

Multiple Count Adjustment

| | | |
|---|---|---|
| Group One (count 1): | 1 unit | U.S.S.G. § 3D1.4(a) |
| Group Two (count 2): | ½ unit | U.S.S.G. § 3D1.4(b) |

16

1   Group Three (count 3):        ½ unit

2   Total Units:                  2 ½ units

3        Combined total offense level

4   Greatest group offense level:  27

5   Grouping increase:            +3  U.S.S.G. § 3D1.4

6   Acceptance of Responsibility  −3  U.S.S.G. § 3E1.1 (¶¶ 76-77)

7   **Total Offense Level:**          **77**

8   Criminal History Cat.:         I

9   Guidelines Range:             70 to 87 months

10       With the exception of the victim related adjustment and the

11  grouping increase, these are the same calculations agreed to by the

12  parties in the plea agreement.

13       B.   **Section 2B1.1(b)(2): substantial financial hardship to**

14            **victims**

15       In the plea agreement, defendant admitted that his securities

16  fraud/investment fraud offense "resulted in substantial financial

17  hardship to more than 25 victims," and that Section 2B1.1(b)(2)(C)'s

18  six level increase for substantial financial hardship to 25 or more

19  victims applies.  (DE 6 (Plea Agreement) at 18, 23.)  The PSR found

20  that only the two-level enhancement for one or more victims suffering

21  substantial financial hardship was applicable.  (DE 18 (PSR) ¶ 68.)

22       Pursuant to Section 2B1.1(b)(2), a 2-level enhancement is

23  applied if the offense (i) involved 10 or more victims; (ii) was

24  committed through mass marketing; or (iii) resulted in substantial

25  financial hardship to one or more victims.  (U.S.S.G.

26  § 2B1.1(b)(2)(A).)  Both subsections (i) and (iii) apply here because

27  there are more than 10 victims and the offense resulted in

28  substantial financial harm to one or more victims.

                                17

However, a larger increase applies if more victims experienced substantial financial hardship.  Section 2B1.1(b)(2) provides for a 4-level increase if the offense resulted in substantial financial hardship to five or more victims or a 6-level increase if the offense resulted in substantial financial hardship to 25 or more victims.  (U.S.S.G. § 2B1.1(b)(2)(B)-(C).)  Application Note 4(F) identifies several factors to consider when determining whether the offense resulted in substantial financial hardship to a victim, including suffering substantial loss of a retirement, education, or other savings or investment fund; making substantial changes to his or her employment, such as postponing his or her retirement plans; or making substantial changes to his or her living arrangements, such as relocating to a less expensive home.  (U.S.S.G. § 2B1.1, App.n. 4(F).)

Here, in the plea agreement and the change of plea hearing, defendant admitted that "[i]n his fraudulent securities/investment fraud scheme, defendant victimized more than 100 individuals, which resulted in substantial financial hardship to more than 25 victims." (DE 6 (Plea Agreement) at 18.).  Defendant also stipulated in the plea agreement that the six-level increase for substantial financial hardship for 25 or more victims applied in this case.  (*Id*. at 23.)

The factual basis also provides examples of how victims suffered financial hardship, including:

- **Victim M.Z.**: invested her life savings, which she planned to use to retire.

- **Victim I.M.**: "You have no idea how bad I need my money."

- **Victim J.H.**: "Really hoping for good news, Nadia's grandma (Mary's mom) is in the hospital and not doing well  I'd

18

like to help out with if I can.  E-Jay is also struggling pretty bad."

- Victim: "I just want you to know that I'm very bad economically and that I need my money as soon as possible I have my wife sick and my dad I have to operate in Mexico."

In addition, the recently filed under seal letters, several victims wrote:

- Victim M.R.: "ran out of my life savings";
- Victim L.R.: "lost all my savings";
- Victim A.S.: invested her "hard-earned lifetime retirement savings" and a personal loan from Bank of America;
- Victim M.Z.: invested "all of my money that I had been setting for my retirement plan";
- Victim S.R.M.: invested part of her 401(k);
- Victim N.T.: invested the savings intended to cover wedding expenses.

Therefore, the government believes that given (a) defendant's specific admission that the offense "resulted in substantial financial hardship to more than 25 victims"; (b) the facts regarding the victims detailed in the factual basis who suffered substantial financial hardship; and (c) the additional victims who in their letters indicated substantial financial hardship, the Court can find that Section 2B1.1(b)(2)(c)'s six-level increase applies for substantial financial hardship to 25 or more victims.

### C.   Grouping calculation

For Section 3D1.4's multiple count adjustment, the PSR concluded that there were three separate groups: (1) Group#1 (count-1: offense level 27); (2) Group#2 (count-2: offense level 22); and (3) Group#3

19

(count-1: offense level 23).  (PSR ¶ 89.)

That conclusion differs from the parties' agreement in the plea agreement, which was that there were only two groups: (1) Group#1 (counts one and three); and (2) Group#2 (count two).

Section 3D1.2(d) provides that when the offense level is determined largely on the basis of the total amount of harm or loss, those counts should be grouped together.  That Section also specifically provides that offenses covered by Section 2B1.1 are to be grouped together under Section 3D1.2(d).  Example 3 of Application Note 6 further provides as an example of when separate fraud offenses/scheme should group: "The defendant is convicted of five counts of mail fraud and ten counts of wire fraud.  Although the counts arise from various schemes, each involves a monetary objective.  All fifteen counts are to be grouped together."

That's the case here with counts one and three.  Both of those counts are fraud offenses.  Both of those counts are governed by Section 2B1.1, so should be grouped together.  Both of them involve a monetary objective, so they should be grouped together.  Thus, under Section 3D1.2(d), counts one and three should be grouped together in one group.

Accordingly, the government believes that the correct grouping is only 1½ units, instead of 2½ units:

Combined offense level calculation:

| | | |
|---|---|---|
| Group One (counts 1 and 3): | 1 unit | U.S.S.G. § 3D1.4(a) |
| Group Two (count 2): | ½ unit | U.S.S.G. § 3D1.4(b) |
| Total Units: | 1½ units | |

**FINAL COMBINED OFFENSE LEVEL**

Total offense level count-1:    31

| | | |
|---|---|---|
| 1 | Increase from grouping:          +1 | U.S.S.G. § 3D1.4 |
| 2 | Acceptance of responsibility:    <u>-3</u> | U.S.S.G. § 3E1.1 |

**Combined Total Offense Level:        29**

Therefore, defendant's final Guidelines sentencing range for a final offense level of 29 with Criminal History Category I is 87 to 108 months of imprisonment.

## IV.  VICTIM LETTERS

The government will be filing, under seal, more than 10 letters received from victims.  In addition to providing facts and statements regarding their financial hardship (detailed *supra*), victims also expressed their feelings and judgment about defendant, with several examples here:

**<u>Investment/securities fraud victims</u>**

- <u>Victims J.H. and N.H.</u>: "Mr. Cirillo has no remorse for his actions, and I believe he already has plans for his next scheme to defraud more families of their money."

- <u>Victim E.S.</u>: "Robert is manipulative, cruel, and uncaring for those he affects.  It makes me angry he has affected so many families that have given their savings in hopes they could grow that money more.  Instead we have been lied to and cheated on.  We ask for justice, and hope all the money from the people he had stolen from be returned.  I hope Robert Louis Cirillo can not continue scamming hardworking and honest people."

- <u>Victim T.S.</u>:  "[Defendant] is a manipulative and dishonest person."

- <u>Victim M.G.L.</u>: "My friends would receive threatening text messages from [defendant], after hearing these horrific

21

experiences my friends had to go through I began to fear that if I reached out I would be receiving threatening messages as well….. By means of this letter, I hereby cordially request the [Court] I [name] remain anonymous at the hearing of [defendant] I fear [defendant] will do something to me or would retaliate against me."

- S.R.M.: "I called [defendant] and I begged him to even give me a few dlls. A least [sic] $500.00 Dlls. To complete for the expenses for my Dads funeral that was on November 15, 2018. [Defendant] replied that he was very sorry but the money had a delayed and that he would pay later….. I had to change my cellphone number and my address because of the threats that [defendant] made me by phone and calls."

- Victim L.R.: "He just scammed me and made fun of me every time I send him messages …. I was very stressed I had lost all my savings I was craying [sic] I knew they had robbed me I did not sleep thinking about what I had done it is the worst thing that has happened to me in my life."

- Victim M.R.: "I ran out of my life savings and learned the lesson that one should not trust anoyene. [sic]"

- Victim A.V.S.: "The money I invested with [defendant] was my hard-earned lifetime retirement savings. All these caused by an unscrupulous individual that even thought [sic] I begged him to pay back my invested money, he never responded my several calls."

- Victim N.T.: "We had to pay our wedding venue on certain date since we were under a contract and Robert just kept postponing paying the loans. He even offered to pay

directly to our wedding venue but never did. He even asked us to cancel our wedding, that is when we realized that we were not going to get our money back, which created a big problem to me and my husband, because in reality we had given Robert all of our savings."

**Grandfather scam victim**

- Victim D.Q.: "One of the defendant's three guilty pleas is specific to me. I will never completely get over my losses, of money and of self-esteem. The 100-plus victims of his securities fraud – at least one of whom lost her life savings – collectively lost ten times as much money as I did.  Your honor, please impose a sentence that fits the harm he caused to us all."

## V.   RECENT OBSTRUCTIVE AND FRAUDULENT ACTIONS BY DEFENDANT

Even after the FBI and IRS-CI had investigated him and he had pleaded guilty, while awaiting sentencing, defendant appears to have still been up to no good.  That is, in July 2022, defendant asked one of the victims of his securities/investment fraud scheme for money, and the victim gave defendant more than $400.  But defendant kept wanting more money from that victim.  For example, defendant called the victim 12 times on the same day (August 19, 2022), and when defendant failed to get more money, he called that same victim 11 more times the following day (August 20, 2022), continuing to try to get more money from that victim.  Ultimately, the victim stopped answering or giving defendant any more money.  Defendant also provided that victim checks signed by defendant that were to be used as purported payment to additional victims in the amounts of $8,000, $8,000, $7,000, and $4,000, but when one of the victims deposited one

23

of those checks, it bounced (just like the purported payment checks defendant gave victims during the underlying scheme).

Even more troubling, when defendant believed that the Court and/or government became aware that he had provided those worthless checks to victims, defendant directed the victim to rip up those checks.

Thus, defendant appears to have not only continued in his fraudulent behavior – even while awaiting sentencing by the Court – but he also attempted to obstruct justice by trying to destroy evidence.

## VI. GOVERNMENT'S POSITION REGARDING SENTENCING

### A.   Summary of the Government's Position

Defendant committed several serious federal felonies.  His securities/investment fraud scheme victimized more than 100 victims for more than $3 million.  Last year, he participated in a conspiracy to defraud an 82-year-old victim of approximately $400,000, which defendant spent for himself.  And he failed to report any of those millions of dollars of income to the IRS.

In addition to the seriousness of those felonies, their facts indicate that a sizable prison sentence is required to punish defendant, specifically deter him, and for general deterrence. Defendant admitted that his crime was an affinity crime that targeted members of the Hispanic community, and many of them were of limited means.  In the plea agreement, defendant admitted that from in or around March 2021 to April 2021, defendant participated in a fraudulent scheme with others to defraud victim D.Q., a senior citizen, of approximately $400,000.  The victim of defendant's Grandparent scam is 82 years old.  Defendant victimized more than 100

24

people, and even threatened some of them so they would keep quiet,
including stating that if they made problems for him, they could go
"for the [expletive] hole in the [expletive] desert."

Last, while awaiting sentencing after pleading guilty in this
case, defendant continued in his fraudulent behavior by re-
victimizing a prior victim by convincing that victim to give him
hundreds of dollars, and again providing worthless checks to victims
(that would again bounce).

Thus, the government recommends the low end of the Guidelines
range as agreed by the parties: 87 months' imprisonment, followed by
three years of supervised release, and restitution.

**B.   The § 3553(a) factors call for the recommended sentence.**

Under 18 U.S.C. § 3553(a), the Court should impose a sentence
"sufficient, but not greater than necessary, to comply with the
purposes" of sentencing as set forth in § 3553(a)(2).   The Court is
to consider various factors in determining the particular sentence,
including:

> (1) the nature and circumstances of the offense and the
> history and characteristics of the defendant; [¶] (2) the
> need for the sentence imposed -- [¶] (A) to reflect the
> seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense; [and] (C)
> to afford adequate deterrence to criminal conduct; [and] (C)
> to protect the public from further crimes of the defendant;
> . . . [¶] (4) the kinds of sentence and the sentencing
> range established [in the Sentencing Guidelines]; . . . [¶]
> (6) the need to avoid unwarranted sentence disparities
> among defendants with similar records who have been found
> guilty of similar conduct; and [¶] (7) the need to provide
> restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Here, application of those factors supports the conclusion that
the recommended low-end Guidelines sentence is a reasonable and
appropriate sentence for defendant.

1          **1.   Nature, Circumstances, and Seriousness of the Offenses**

2          Defendant committed serious crimes, involving actual loss

3     exceeding $3,500,000, which he perpetrated by not only taking

4     advantage of investment-victims, but also stinging a Grandfather of

5     approximately $400,000.  All in all, these crimes – the millions

6     dollar investment/securities fraud and the wire fraud conspiracy –

7     did not have to happen.  Instead, defendant believed he would not be

8     punished even though he used his abilities to cheat and steal from

9     vulnerable victims, so the sentence in this case should show him and

10    the public that that is not the case.

11         Moreover, defendant's crimes did not occur just over a short

12    period, or just a few victims.  Defendant engaged in his fraudulent

13    scheme for more than five years, and victimized more than 100

14    victims.  And he did so not only by lying, but also by fabricating

15    bank documents.

16         Further, defendant also threatened victims to attempt to

17    intimidate them from blowing the whistle on him.

18         **2.   Defendant's history and characteristics**

19         On balance, defendant's history and characteristics lack

20    significant mitigation in this case.  Defendant has no criminal

21    history, which is adequately taken into consideration by the

22    Guidelines.  But looking at what he did shows that his behavior

23    presents someone who needs to be sufficiently punished.

24         Defendant has shown by his criminal behavior that he has

25    contempt for the law and no concern for the victims he was hurting.

26    While he was running his million dollars fraud scheme, defendant was

27    scheming to commit other crimes, including laundering counterfeit

28    money at a Las Vegas casino.  Further, defendant discussed committing

26

credit card and identity theft, and when agents search his residence in August 2019, they found evidence of credit card/identity theft fraud, including a photograph of a fraudulently obtained credit card in the name of E.I., which resulted from a fraudulent application defendant had caused in that identity.

As if that were not enough, defendant also participated in a separate scheme where victim D.Q., a senior citizen, was defrauded out of approximately $400,000.  In that fraudulent scheme, defendant's co-schemers tricked victim D.Q. into believing that his grandson had been arrested by the Sacramento Police Department for possession of illegal narcotics, which was false, and they also pretended to be other people when communicating with victim D.Q., including posing as a sergeant with the Sacramento PD, a public defender, and D.Q.'s grandson.  The money then went to defendant's bank account, which he used for his personal benefit.

Defendant's long-running and varied criminal behavior shows that he needs to be adequately punished, so he stops victimizing other people.

### 3.   <u>Adequate deterrence to defendant and the public</u>

In this case, general deterrence is important.  Not only was this a large investment fraud scheme, but defendant also admitted that his scheme was an "affinity crime," which exploited the trust and friendship that exist in groups of people who have something in common, and here he targeted members of the Hispanic community.  Due to the size of defendant's fraud and the number of victims from the Hispanic community, even a Spanish language channel ran a story about defendant's fraudulent scheme before and after he was charged.  Thus, the sentence in this case should be sufficient to deter others from

participating in similar affinity crimes.

Defendant has also shown through his varied criminal conduct that he needs to be specifically deterred, including his continuing to attempt to victimize others while awaiting sentencing in this case.

Given defendant's conduct during the underlying investment/securities fraud scheme – including the threatening victims – as well as his additional separate crimes – including victimizing a senior citizen for almost $400,000, defendant's sentence must specifically deter him from criminal conduct. Here, that sentence must deter someone who orchestrated and operated an investment fraud scheme that victimized more than 100 people for more than $3,000,000, stole from a Grandfather, failed to report and pay taxes of approximately $675,000, and attempted and discussed committing other crimes such as money laundering and identity theft.

Further, as discussed above, even after the FBI and IRS-CI had investigated him and he had pleaded guilty, while awaiting sentencing, defendant appears to have still been up to no good. For example, in the last couple months, he convinced a victim to provide him with several hundred dollars, and also provided purported payment checks for victims, which of course would bounce (just like during the scheme).

Thus, the government's recommended sentence for defendant was carefully and individually fashioned to address both general and specific deterrence.

### 4. <u>Need to Protect the Public from Defendant</u>

The government agrees with Probation that supervision is appropriate in this case. Even though defendant lacks criminal

history, defendant's first criminal convictions were serious federal felonies that involved millions of dollars of fraudulent proceeds with more than 100 victims, as well as a tax offense.  The span of defendant's criminal behavior – both as to type of crimes and the length of the scheme – shows that the public needs to be protected from defendant, particularly as shown above that defendant appears to continue to attempt to victimize others.

Defendant has shown from his conduct that he is willing to victimize others, and in a variety of ways, so his sentence must be fashioned to protect the public from further crimes by defendant.

### 5.   Need to Avoid Unwarranted Sentence Disparities

The government's recommended sentence of approximately 7 years of imprisonment does not appear to be disparate for a millions dollar investment/securities fraud scheme, particularly when coupled with the wire fraud conspiracy and false tax return.  Moreover, the recommended sentence is a low end Guidelines sentence, which also appears not to be unreasonable for such a large scale fraud with many victims.

The government believes that based upon the facts in this case, the recommended sentence of 87 months of imprisonment, which is the low end of the applicable Guidelines range, adequately addresses the Section 3553(a) factors.

### C.   Restitution

In the plea agreement, defendant agreed to make full restitution.  The government respectfully recommends that defendant be ordered to pay restitution as follows:

- $2,759,910.53 to securities/investment fraud victims (count one);

29

- $675,898 to the IRS (count two); and
- $399,550 to victim D.Q. (count three).

**VII. CONCLUSION**

Defendant victimized hundreds of people – many of modest means – over many years, to the tune of more than $3,000,000.  That involved lying, over and over again.  More recently, last year, he participated in a separate scheme to rip off a senior citizen of $400,000 in a Grandfather scam.  Defendant was not destitute or hurting – in fact, he owned an Alfa Romeo and a Mercedes Benz – but he nonetheless chose to use his skills to effectuate his fraudulent schemes.  Accordingly, defendant's particular financial condition at the time of the fraudulent scheme is another reason justifying sentencing him to a substantial term of imprisonment:

> A crime of fraud by one who already has more than
> enough—and who cannot argue that he suffered a
> deprived or abusive childhood or the compulsion of an
> expensive addiction—is simply a crime of greed.  A
> crime of fraud by one who is otherwise successful,
> apparently by legitimate means, is also particularly
> disturbing.  Thus, in light of [defendant]'s history
> and characteristics, this is a case of greed for the
> sake of greed, not greed for the sake of gain.

United States v. Miell, 744 F. Supp. 2d 904, 955 (N.D. Iowa 2010) (imposing sentence of 240 months of imprisonment).

General deterrence is an important consideration in this case. Defendant's investment/securities fraud scheme exceeded $3,000,000 and had more than 100 victims.  Defendant targeted members of the Hispanic community, and it was reported in the Hispanic media.  A

sizable sentence will send a strong and public message that fraud will be swiftly and appropriately punished and that those engaging in it can and will be held accountable, with many years in federal prison, especially when targeting vulnerable victims or otherwise engaging in affinity crimes.

Likewise, general deterrence also supports a sizable sentence for defendant's Grandfather scam, which defendant participated separately and in addition to his investment fraud scheme. These types of crimes targeting the elderly are becoming more and more common, so the sentence in this case should send the message that such crimes will receive swift and severe punishment. Thus, the crime against the 82 year old victim, as well as the affinity character of his investment fraud scheme, merits a substantial prison sentence, both for punishment and general and specific deterrence.

Last, defendant has demonstrated his disrespect for the law by not only discussing and apparently engaging in other fraudulent conduct, but also by failing to accurately report millions of dollars in income to the IRS, as well as continuing to victimize others, as recently as earlier this month.

In conclusion, based upon the applicable Section 3553(a) factors, the government believes its recommended sentence is appropriate here.

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence:

1.   87 months of imprisonment;

2.   Three years of supervised release;

3.   $3,835,358.53 total restitution ($2,759,910.53 total to the investment/securities fraud victims; $399,550 to victim

D.Q., and $675,898 to the IRS); and

4.   $300 special assessment.